# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| RUSSEL McELMURRY, d/b/a<br>McELMURRY CHEMICAL, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:04CV389 |
| | ) | |
| ALEX FERGUSSON, INC. | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

This matter is before the court on Defendant's motion for summary judgment [docket no. 30]. Also pending before the court is Defendant's motion to strike [docket no. 46] certain portions of Plaintiff's Declaration in opposition to the motion for summary judgment. Plaintiff has responded in opposition to the motions, and the matter is ripe for disposition. Furthermore, the parties have consented to the jurisdiction of the magistrate judge. For the following reasons, the court will deny Defendant's motion to strike. Furthermore, the court will deny Defendant's motion for summary judgment in part and grant it in part.

## STATEMENT OF THE CASE

On March 24, 2004, Plaintiff sued Defendant in state court, alleging claims for breach of contract, conversion, tortious interference with business relations, violation of the North Carolina Trade Secrets Protection Act, and unfair and deceptive trade

-1-

practices. On May 4, 2004, Defendant removed the case to this court based on diversity jurisdiction. On June 6, 2004, Defendant filed its Answer and alleged a counterclaim against Plaintiff for breach of contract. On August 22, 2005, Defendant filed a motion for summary judgment, and that motion is now pending before the court. Furthermore, on October 10, 2005, Defendant also filed a motion to strike portions of the Declaration offered by Plaintiff Russel McElmurry, and that motion is also pending.

## FACTS

The following facts are taken primarily from Plaintiff's statement of the facts and are taken in the light most favorable to Plaintiff:

Plaintiff Russel McElmurry, a North Carolina resident, is an independent chemical reseller. Plaintiff owns McElmurry Chemical and has operated it as a sole proprietorship for the past 25 years.[1] (McElmurry Decl. ¶ 4.) McElmurry Chemical provides its customers in the food-processing industry with services and products relating to food-processing sanitation. *Id.* McElmurry Chemical offers product sales, product development, technical expertise, and technical consultation. *Id.*

Defendant Alex C. Fergusson, Inc. ("AFCO") is a Pennsylvania corporation that develops, blends, and sells chemical cleaning and sanitizing products. In the industry, a company such as Defendant AFCO is known as a "tolling" agent. A

---

[1] Here, the term "Plaintiff" is meant to refer to either Russel McElmurry as an individual or to his company McElmurry Chemical, where appropriate.

tolling agent is someone who receives a proprietary and confidential chemical formula from a third party and manufactures the chemical for sale to the third party's customers.[2]  (*Id.* ¶ 6; *see also* Denman Decl. ¶¶ 2-4.)

Plaintiff maintains that he possesses a significant amount of proprietary and confidential information, which includes, but is not limited to, chemical formulas, customer pricing, cost information, and other confidential and proprietary information. Plaintiff uses this confidential information to develop and deliver products to Plaintiff's customers. Plaintiff says that he maintained and developed this confidential information over the course of 30 years in the food sanitation industry and that it is a critical part of Plaintiff's business.  Plaintiff asserts that many of the formulas that he possesses, including at least five (5) of the formulas he provided to Defendant, are trade secrets and are indicated as such on Material Safety Data Sheets provided to Defendant, other tolling manufacturers, and customers of Plaintiff.  *Id.*

Plaintiff's Relationship with Hatfield Meats

Hatfield Quality Meats, Inc. ("Hatfield") is a Pennsylvania meat product producer.  Plaintiff Russel McElmurry began selling products to Hatfield in the late 1970s when he worked for Astro Products.  (McElmurry Decl. ¶ 16.)  When Plaintiff

---

[2]  Plaintiff further explains that tolling manufacturers take Plaintiff's chemical formulas (along with his USDA approvals, Material Safety Data Sheets, and labels) and manufacture the products for Plaintiff.  (*Id.* ¶ 7; *see also* Denman Decl. ¶¶ 2-4.)  These products are then shipped to Plaintiff's customers.  *Id.*

founded McElmurry Chemical in 1980, Plaintiff began selling McElmurry Chemical products to Hatfield. (McElmurry Decl. ¶ 16.) These products included a product called Atom Plus, and Plaintiff has used the same formula for the Atom Plus sold to Hatfield from the early 1980s until December 2003. (McElmurry Decl. ¶ 6.)

Defendant Becomes one of Plaintiff's Tolling Manufacturers

Initially, Defendant did not manufacture any of the products that Plaintiff sold to Hatfield. (McElmurry Decl. ¶ 16.) As early as 1983, a company named Loos and Dilworth manufactured the Atom Plus that Plaintiff sold to Hatfield. (McElmurry Decl. ¶ 6 & Ex. A.) In 1986, however, Plaintiff began using Defendant to manufacture custom chemical products that Plaintiff sold directly to Hatfield. (McElmurry Decl. ¶ 16.) Specifically, in Spring 1986, Plaintiff contacted Carter Fergusson ("Fergusson"), the then-owner and president of Defendant, to discuss the possibility of Defendant serving as a tolling manufacturer for Plaintiff. *Id.* ¶ 7a. By letter dated April 15, 1986, Defendant agreed to manufacture numerous products for McElmurry Chemical. (*Id.* ¶ 7a & Ex. B.) Shortly thereafter, Plaintiff provided proprietary and confidential chemical formulas to Defendant, including the chemical formulas for Plaintiff's products known as A Plus, Atom Plus, K-Foam, M C 25, M C Supreme, McShine, Power Clean, Release, and STC. (*Id.* ¶ 8; *see also* Sorgenfrei Dep. 26:18 to 27:20; 115:1-10; 125:18 to 126:2; 134:2-12; *see also* Noble Decl. at Ex. G.) With regard to Atom Plus, K-Foam, and Release, Defendant manufactured these products–using the proprietary and confidential chemical formulas developed and provided by Plaintiff–until November 2003. (McElmurry Decl. ¶ 8.)

-4-

In addition to providing its formulas to Defendant, Plaintiff also provided Defendant with labeling to place on the chemical products it was manufacturing for Plaintiff. (McElmurry Decl. ¶ 9 & Ex. C; Sorgenfrei Dep. 113:12-19; 205:6-11.) Around 1998, Plaintiff allowed Defendant to place some of their labels on Plaintiff's products that were manufactured by Defendant, but Plaintiff maintains that at no time did this affect the chemical composition of the products being sold to Hatfield or the ownership of the chemical formulas used to manufacture the products. (McElmurry Decl. ¶ 9 & Ex. C.)

The Confidentiality Agreement

On April 6, 1993, in an effort to protect their confidential information and customer relationship, Plaintiff and Defendant executed a Confidentiality Agreement ("the Agreement") (McElmurry Decl. ¶ 10 & Ex. D.) Before executing the Agreement, Plaintiff was concerned that Defendant would use his chemical formulas and other proprietary and confidential information to directly compete against Plaintiff's business. (McElmurry Decl. ¶ 13.) According to Plaintiff, Plaintiff had not sought a confidentiality agreement from prior tolling manufacturers because, unlike Defendant, these tolling manufacturers did not compete with Plaintiff in the food sanitation marketplace, and Defendant was unique in this regard. Thus, Plaintiff deemed the agreement to be necessary for any further business relationship between Plaintiff and Defendant, as well as critical to protecting against the disclosure of the proprietary and confidential information already shared between the parties. (McElmurry Decl. ¶ 11.)

The Confidentiality Agreement was wholly prepared by Robert Sistowicz ("Sistowitcz"), the then-President of Defendant. *Id.* at ¶ 12. Plaintiff did not prepare the Agreement, nor did he make any modifications to the Agreement.[3] (McElmurry Decl. ¶ 12.) The Agreement reads as follows:

## CONFIDENTIALITY AGREEMENT

This agreement, made between [Plaintiff] and [Defendant], covers discussions and proprietary information of all types shared between the two companies. It is understood that the sharing of certain confidential information is necessary to maintain a business relationship in which [Defendant] would provide chemical compounds to [Plaintiff] with private label and in which [Plaintiff] would sell these products to its customers. In this relationship [Plaintiff] will furnish [Defendant] with certain formulations and is dependent on [Defendant] for ongoing supply of [Defendant] formulations.

[Plaintiff] and [Defendant] agree that neither company will use the other's formulas or other proprietary knowledge learned as a result of these discussions to unfair advantage and/or with the purpose of selling the same or similar products to the other's customers, nor will either company share these formulas or knowledge with any third party, including agents, manufacturers representatives, distributors, or any other entity, without the express consent of the other company.

This agreement will remain in effect until termination by prior mutual consent.

(McElmurry Decl., Ex. D.) Plaintiff maintains that since the execution of the Agreement, he has had repeated conversations and communications with

---

[3] Plaintiff maintains that he did review the Agreement and he understood it to mean that it protected the chemical formulas and other proprietary and confidential information that Plaintiff and Defendant had shared in the past, as well as chemical formulas and information that would be shared in the future. After reviewing the Agreement provided by Sistowicz, both Plaintiff and Sistowicz signed the Agreement. (McElmurry Decl. ¶ 12 & Ex. D.)

Defendant's management, including communications with Defendant's former presidents, Robert Sistowicz and Mike Brock, and Defendant's current president Mike Hinkle ("Hinkle"). (McElmurry Decl. ¶ 14.) Plaintiff maintains that by virtue of the Agreement and these conversations with Defendant's management, "Defendant knew and understood that the information made available to Defendant was highly sensitive and proprietary business information." *Id.* Plaintiff maintains that Defendant also knew that Plaintiff took significant steps on an on-going basis to protect its confidentiality and secrecy, and that Plaintiff achieved competitive advantages based upon his confidential information and would be placed at a competitive disadvantage if such information were disclosed to a competitor or certain customers, or used in competition with his company by Defendant or another competitor. *Id.*

Events Leading up to this Lawsuit

In September 2003, Jane Roseboro ("Roseboro"), the Sanitation Supervisor at Hatfield, informed Plaintiff that Hatfield's management team wanted to conduct an audit of Hatfield's sanitation department. (McElmurry Decl. ¶ 17). Plaintiff, along with Defendant's president Mike Hinkle, subsequently met with Roseboro, who informed them that Hatfield was seeking to reduce its labor costs and that Hatfield wanted to give Plaintiff and Defendant the opportunity to conduct an audit of Hatfield's sanitation department to figure out how to reduce costs. (Roseboro Dep. 42:7 to 43:17-24; 45:1-7.) Roseboro stated in her deposition that she did not recall

Hatfield being concerned over the cost of Plaintiff's chemicals and that it was her understanding, at least until she learned of the dispute between the parties, that Plaintiff and Defendant were working together as one entity; i.e., that Russel McElmurry was "somehow affiliated with AFCO." (Roseboro Dep. 45:1-7.)

In conjunction with the impending audit, Plaintiff contacted Defendant to determine what assistance he could provide. (McElmurry Decl. ¶ 17.) Plaintiff knew that Defendant had experience with audits and could provide some insight. *Id.* After repeated requests by Plaintiff, Defendant sent one of its employees, Joe Cecil ("Cecil"), to Hatfield's facility to assist Plaintiff with the Hatfield audit. According to Defendant's Vice-President, Cecil "was and still is our best guy at doing labor analysis." (Race Dep. 51:20-21.) According to Jane Roseboro, however, Hatfield was not impressed with Cecil's analysis. As Roseboro stated in her deposition, Cecil "seemed actually to have given up on Hatfield" and the day after he arrived at Hafield, Cecil "just said this isn't going to work and he left." (Roseboro Dep. 49:9-15.) According to Roseboro, Cecil was "more interested in taking breaks, smoking cigarettes, whatever, than working." (Roseboro Dep. 50:3-4.) Hatfield employees informed Plainitff about Cecil's behavior, and Plaintiff told them that he would speak with Defendant about Cecil. (Roseboro Dep. 50:7-24.)

On or about November 4, 2003, Plaintiff met with Defendant's current president, Mike Hinkle. (McElmurry Decl. ¶ 18.) Plaintiff and Hinkle discussed a strategy to address the impending audit at Hatfield and the threat for outside

-8-

competition. (McElmurry Decl. ¶ 18.) Plaintiff implored Hinkle that Plaintiff and Defendant needed to pursue the Hatfield account and prepare a proposal. During this meeting, Hinkle appeared to be writing off the Hatfield account. After this meeting, Plaintiff and Hinkle talked on the telephone. According to Plaintiff, during the course of the call, Hinkle admitted that Defendant had been contacting Hatfield directly. (McElmurry Decl. ¶ 19.) In response, Plaintiff reminded Hinkle of the Confidentiality Agreement between the parties, but Hinkle simply dismissed the Agreement as unenforceable. (McElmurry Decl. ¶ 19.)

On November 11, 2003, Plaintiff traveled to Hatfield's facility in Pennsylvania to discuss the account. (McElmurry Decl. ¶ 20.) McElmurry met with Alan Oser, who then served as Hatfield's Vice President of Quality Control. *Id.* Oser was responsible for sanitation, including the acquisition of cleaning chemicals. *Id.* During this meeting, Oser explained that the audit was related to labor costs. *Id.* Oser further indicated that he wanted to retain Plaintiff because he valued Plaintiff's years of experience with Hatfield. *Id.* Plaintiff told Oser that he would continue to work on the audit and would get back to him.

Around Thanksgiving 2003, Hinkle called Plaintiff and told him that Plaintiff and Defendant had lost the Hatfield account and that there was nothing they could do about it. (McElmurry Decl. ¶ 21.) Hinkle told Plaintiff that he believed that competitor Zee Company had won the Hatfield account, and it would only be a matter of weeks before Zee Company was awarded the business. *Id.* On December

-9-

1, 2003, Plaintiff traveled to Defendant's facility in Pennsylvania and met with Hinkle. (McElmurry Decl. ¶ 22.) During this meeting, Hinkle reiterated to Plaintiff that the Hatfield account was lost and "to the extent it could be saved, [Plaintiff] must not get involved." *Id.* Hinkle told Plaintiff that in the unlikely event that Defendant somehow retained the Hatfield account that Plaintiff would receive a certain percentage of the account. *Id.* Hinkle told Plaintiff that he was "family" and that Hinkle was going to "take care of [Plaintiff's] business." *Id.* Hinkle recalled that during this conversation, he felt "somewhat obligated to do something." Moreover, during the conversation, Hinkle told Plaintiff that "we would work something out. That I would come up with some–some kind of an override." (Hinkle Dep. 98:12 to 99:4.)

On December 2, 2003–one day after Hinkle told Plaintiff that the Hatfield account was most likely lost to Zee, Hinkle wrote a letter to Allan Oser at Hatfield, stating:

> Dear Allan,
>
> We appreciate the opportunity to evaluate the operation and to develop a business plan that will improve efficiency, maintain effectiveness, and reduce the costs to clean. The following is the new price schedule for direct purchases from AFCO. With the opportunity to do business direct we will be able to provide local service and support. . . . . We look forward [to] presenting what AFCO and Hatfield can do together.

(Roseboro Dep. 72:2-17; Noble Decl. at Ex. H.) Attached to Hinkle's letter was a product price list. On the product price list, some of Plaintiff's chemical products are listed as "AFCO Product." *Id.* For instance, "Release" is one of the chemical

-10-

formulas that Plaintiff had previously provided to Defendant, and it was listed on the product price list. (McElmurry Decl. ¶¶ 8, 24.)

In early December 2003, Hinkle and Defendant's Vice President of Sales, Bill Race, visited the Hatfield facility without Plaintiff being there. (Oser Dep. 29:2-20.) Race testified in his deposition that Hatfield called Defendant to set up the meeting, and Defendant "didn't know exactly what it was about." (Race Dep. 52:22 to 53:21.) Race further stated in his deposition that Hatfield's representative said that "[Plaintiff] was out and that [Hatfield] w[as] seriously contemplating going to Zee, and if Defendant wanted any chance of keeping or maintaining–getting the business, that we would have get involved immediately." (Race Dep. 56:10-22.) According to Plaintiff, however, Hatfield "tells a different story" about the December contacts between Defendant and Hatfield. Plaintiff points out, for instance, that Oser testified that Hatfield did not call Defendant in for a meeting. (Oser Dep. 27:11-21.) Rather, Oser testified in his deposition that "[Defendant] contacted me at some point and basically said that the account was being shifted to this corporate account. And they said that they would be selling the products directly to Hatfield, rather than the products being sold through [Plaintiff]." (Oser Dep. 27:11-21.) When asked if he called a meeting with Defendant and said "[Defendant,] you're in trouble here," Oser replied, "I don't recall any such meeting. For one thing, I wouldn't have known who to call at [Defendant's office]." (Oser Dep. 27:22 to 28:1.) Oser testified that Defendant represented to Hatfield that "there was a decision made elsewhere that

-11-

the products were going to be sold to Hatfield in this corporate account, that [Defendant] was going to sell the product to Hatfield, not [Plaintiff]. The communication I had was, [Plaintiff] is not representing the account. And that communication came from [Defendant]."[4]  (Oser Dep. 32:1-22.)

In preparing for the audit, Defendant made multiple visits to the Hatfield facility.  (Oser Dep. 29:2-10.)  In their meetings with Hatfield, Defendant's representatives did not explain that Defendant was merely a tolling manufacturer that produced Plaintiff's chemicals for and on behalf of Plaintiff.  (McElmurry Decl. ¶ 7.) Rather, Hinkle and other representatives of Defendant told Hatfield's representatives that "[Plaintiff] was a distributor, as we refer to a distributor, and that we [Defendant AFCO] sold him AFCO detergents."  (Race Dep. 54:19-23.)  In December 2003, Defendant made a formal presentation to Hatfield in its efforts to obtain the Hatfield account.  (Race Dep. 68:8-20; Noble Decl. at Ex. 1.)  Defendant distributed a price list to Hatfield.  The price list included the following three products that use Plaintiff's formulas–AFCO 3484 (sold by Plaintiff as Release), AFCO 5235 (sold by Plaintiff as Atom Plus), and AFCO 2266 (sold by Plaintiff as K-Foam).  (Noble Decl. at Ex. I, p. 22; McElmurry Decl. ¶¶ 8, 24.)  Shortly thereafter, Roseboro called Plaintiff on the phone and told him that Hatfield was going to start purchasing chemicals, including Plaintiff's chemical compounds, directly from Defendant.  (McElmurry Decl. ¶ 23.)

---

[4]  Plaintiff concedes that the facts surrounding the initial meeting between Defendant and Hatfield are "highly disputed, even within Hatfield."  (Pl.'s Br. Opp. Summ. J. at 8 n.3.)  Plaintiff notes, for instance, that Roseboro testified that Oser set up the meeting with Defendant, which Oser denied.  (Roseboro Dep. 54:4-6; Oser Dep. 27:22 to 28:4.)

Plaintiff maintains that Hatfield is currently purchasing the same chemicals from Defendant that it once purchased from Plaintiff. (Oser Dep. 53:8-16 (responding affirmatively that it was his understanding when Hatfield began buying chemicals from Defendant rather than from McElmurry in 2003 that the chemicals were "the same . . . chemicals that [Hatifeld] had been purchasing from [Plaintiff] previously" and that the chemicals "did the same thing in the facility; the function of the chemicals didn't change in terms of how they cleaned and where they cleaned"); *see also* Roseboro Dep. 79:15 to 80:7.) Plaintiff maintains that it supplied Defendant with the formulas to manufacture McElmurry's Atom Plus, Release, and K-Foam products, and that Defendant continues to use those formulas to manufacture and sell chemical compounds directly to Hatfield. (McElmurry Decl. ¶ 24, Noble Decl. at Ex. J, Admission nos. 11, 13, 15, and 18.) Thus, according to Plaintiff, since December 2003 Defendant has been selling directly to Hatfield proprietary formulas that Plaintiff gave to Defendant and has, among other things, breached the parties' Confidentiality Agreement stating that "neither [party] will use the other's formulas or other proprietary knowledge . . . to unfair advantage and/or *with the purpose of selling the same or similar products to the other's customers* . . . ."

## **STANDARD OF REVIEW**

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Zahodnick v. International Bus. Machs. Corp.*, 135 F.3d 911, 913

-13-

(4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact-finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

## ANALYSIS

### Defendant's Motion to Strike Portions of Plaintiff Russel McElmurry's Declaration

Defendant has filed a motion to strike Paragraphs 11, 12, and 14 of the Declaration which Plaintiff Russel McElmurry submitted as an attachment to his response to Defendant's motion for summary judgment. Defendant argues that

-14-

these paragraphs should be stricken because they are not based on Plaintiff's personal knowledge and, furthermore, that Paragraph 11 expressly contradicts Plaintiff's deposition testimony.[5]  Generally, the challenged portions of Plaintiff's Declaration deal with Plaintiff's statements about both his and Sistowicz's understanding of the purpose for the Confidentiality Agreement when they entered into it in 1993.  Defendant first takes issue with Paragraph 11 of Plaintiff's Declaration, which states that "[b]oth Robert Sistowicz ("Sistowicz"), who was then president of [Defendant], and I deemed the [Confidentiality] Agreement to be a necessary component of any further business relationship between the parties as well as critical to protecting against the disclosure of confidential and proprietary information, including trade secrets we had already shared with each other."  Defendant notes, however, that when Plaintiff was asked in his deposition about the Confidentiality Agreement, Plaintiff testified that he "can't image why [Sistowicz] would want to sign [the Confidentiality Agreement], you know."  (1 Russ Dep. 76:8-9.)  Thus, Defendant maintains that as of the time of his deposition, "Plaintiff admitted to having no idea why Mr. Sistowicz would have signed the Confidentiality Agreement," whereas by the time he submitted his Declaration Plaintiff seemed to know exactly why Sistowicz would have signed the Agreement.

---

[5]  Federal Rule of Civil Procedure 56(e) provides that supporting or opposing affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

Defendant also takes issue with the portion of Paragraph 12 in which Plaintiff states that "Sistowicz did not disagree with my understanding of the Agreement, described above." Defendant maintains that in Paragraph 12, "Plaintiff attempts to express an inference or opinion of the alleged declarant, Mr. Sistowicz, without any factual foundation," and that "Plaintiff lacks the personal knowledge sufficient to support the statement in Paragraph 12 of his Declaration." Finally, Defendant maintains that the following statements in Paragraph 14 by Plaintiff regarding what Defendant knew and understood are "unsupported by personal knowledge and factual foundations":

> By virtue of the Agreement, and by reason of my repeated conversations with management of [Defendant], which included conversations and communications with Sistowicz, Mike Brock ("Brock"), a former president of [Defendant], and Mike Hinkle ("Hinkle"), the current president of [Defendant], [Defendant] knew and understood that the Confidential Information I made available to [Defendant] was highly sensitive and proprietary business information. [Defendant] also knew that I took significant steps on an on-going basis to maintain its confidentiality and secrecy. Moreover, [Defendant] knew and understood that I had achieved competitive advantages based upon McElmurry Chemical's Confidential Information and would be placed at a competitive disadvantage if such information were disclosed to a competitor or certain customers, or used in competition with my company by [Defendant] or another competitor of my company.

McElmurry Decl. ¶ 14.

The motion to strike is denied. First, as to Defendant's argument that Paragraph 11 contradicts Plaintiff's deposition testimony, it is true that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement[.]" *Cleveland v. Policy*

-16-

*Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). The purpose behind disregarding contradicting affidavits is to prevent the parting opposing summary judgment from creating a "sham issue of fact." *See Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990). In other words, the non-moving party cannot avoid summary judgment by creating a triable issue that arises merely from the inconsistent testimony. *See Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 438 (4th Cir. 1999). In addressing motions to strike based on conflicting affidavit and deposition testimony, courts have focused on the degree of inconsistency between the two apparently conflicting statements. *See Loney v. Miles*, No. 98-2826, 2000 U.S. App. LEXIS 8673, at *9 (4th Cir. May 3, 2000) (unpublished opinion) ("Watson's deposition repudiated his earlier affidavits *to such a degree* that the earlier statements should be disregarded.") (emphasis added); *see also Rohrbough*, 916 F.2d at 975 ("Dr. Cox's deposition *contrasts starkly* with his affidavit.") (emphasis added).

Here, Defendant fails to recognize the relevancy of the degree of inconsistency between Plaintiff's deposition and affidavit testimony. Indeed, here Plaintiff's Declaration does not "contrast starkly" with his deposition testimony. As Plaintiff notes, the inconsistent deposition statement that Defendant relies upon is one stray remark lifted from a much longer response to a question about Plaintiff's *own* goals in executing the Confidentiality Agreement and was not in response to a specific question about Sistowicz's reasons for executing the Agreement. In other

-17-

words, Plaintiff has not created a "sham issue of fact" with his Declaration testimony that Sistowicz knew the importance and necessity of the Confidentiality Agreement, and it can hardly be said that Plaintiff's Declaration "thoroughly contradicts" his earlier deposition. *Loney*, 2000 U.S. App. LEXIS 8673, at *9; *see also Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc.*, 243 F. Supp. 2d 386, 395 (M.D.N.C. 2003) ("The Court finds that none of the cited instances [of inconsistencies] present such glaring contradictions as to be worthy of being stricken from the record at this stage."). In any event, as Plaintiff notes, regardless of Plaintiff's Declaration testimony, a triable issue of fact already exists because the Agreement *itself* recognizes the reasons why Defendant entered into the Confidentiality Agreement.[6]

The court also rejects Defendant's additional argument that Paragraphs 11, 12, and 14 of Plaintiff's Declaration should be stricken because they contain allegations that are not based on Plaintiff's personal knowledge as required by Federal Rule of Civil Procedure 56(e). The text of Plaintiff's Declaration makes clear that Plaintiff's testimony about the execution of the Confidentiality Agreement is indeed based on Plaintiff's personal knowledge. In supporting the motion to strike, Defendant points to several single sentences, taken out of context from the

---

[6] In Paragraph 11 of the Declaration, Plaintiff states that both he and Mr. Sistowicz "deemed the Agreement to be a necessary component of any further business relationship between the parties as well as critical to protecting against the disclosure of confidential and proprietary information[.]" Similarly, the Confidentiality Agreement states that "[i]t is understood that the sharing of certain confidential information is necessary to maintain a business relationship . . . neither company will use the other's formulas or other proprietary information . . . to unfair advantage[.]"

surrounding paragraphs, to show that Plaintiff lacked personal knowledge.[7] When these sentences are considered within the Declaration as a whole, however, the surrounding words and sentences show that Plaintiff does have the requisite factual foundation and personal knowledge to justify these statements. For instance, Paragraph 12 of the Declaration reads in its entirety:

> I have a specific recollection of Sistowicz preparing the Agreement and asking that I execute it. I did not prepare the Agreement nor did I make any modifications to the Agreement. I reviewed the Agreement and understood that it protected the proprietary information and formulas that [Defendant] and I had shared in the past as well as proprietary information and formulas we would share in the future. After reviewing the Agreement provided to me by Sistowicz, and without making any modifications to the Agreement, both Sistowicz and I signed the Agreement. In connection with its execution, I had discussions with Sistowicz regarding the Agreement and its terms. There was no dispute between Sistowicz and myself regarding our understanding of the Agreement, and Sistowicz did not disagree with my understanding of the Agreement, described above.

McElmurry Decl. ¶ 12. Plaintiff also described in Paragraph 14 how he discussed the Agreement and its terms with several of Defendant's representatives, including Sistowicz, Mike Brock, and Mike Hinkle. Since Plaintiff attended and participated in these conversations, he certainly has personal knowledge of what occurred at these meetings. *See Volumetrics Med. Imaging, Inc.*, 243 F. Supp. 2d at 396 ("[The affiant] attended the February 2000 meetings and thus had personal knowledge of

---

[7] For instance, Defendant points to the following sentences: "Sistowicz did not disagree with my understanding of the Agreement, described    above. . . . [Defendant] knew and understood[.] . . . Robert Sistowicz . . . deemed the Agreement to be a necessary component of any further business relationship between the parties . . ."

the events that took place therein.").  Moreover, to the extent that Defendant is challenging Plaintiff's statements reflecting his own opinions or inferences about what Siztowicz understood the Agreement to mean when the parties executed it, such "inferences are permissible provided they are based on personal knowledge and have a factual foundation."  *See id.* (refusing to strike an affidavit "to the extent it states [the affiant's] understanding of [another person's] statements or [the affiant's] belief as to what [the other person] knew regarding the Agilent negotiations").  For all these reasons, Defendant's motion to strike is denied, and the court will now move on to Defendant's substantive motion for summary judgment.

Choice of Law

Before addressing Defendant's summary judgment motion, the court must first address the thorny issue of which state's laws must apply to Plaintiff's claims.  Here, the parties both assume in their briefs that North Carolina law applies to all claims. The parties and facts in this case, however, are associated with both North Carolina and Pennsylvania, and the case was originally filed in state court and was removed to this court based on diversity jurisdiction.  As a federal court sitting in diversity, this court must apply the substantive law of North Carolina's highest court, the North Carolina Supreme Court, and this includes its choice-of-law rules.  *Private Mortgage Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.,* 296 F.3d 308, 312  (4th Cir. 2002); *Insteel Indus., Inc. v. Costanza Contracting Co.*, 276 F. Supp. 2d 479, 483 (E.D. Va. 2003).   Therefore, before proceeding further, the court must examine North

-20-

Carolina's choice-of-law rules to determine which state's substantive law must be applied.

Under North Carolina's choice of law rules, for claims sounding in contract, the governing law is determined by *lex loci contractus*, or the law of the place where the contract was formed. *Fortune Ins. Co. v. Owens*, 351 N.C. 424, 428, 526 S.E.2d 463, 466 (2000). The place where a contract is formed is determined by the "place at which the last act was done by either of the parties essential to a meeting of the minds." *Key Motorsports, Inc. v. Speedvision Network, L.L.C.*, 40 F. Supp. 2d 344, 347 (M.D.N.C. 1999) (quoting *Fast v. Gulley*, 271 N.C. 208, 212, 155 S.E.2d 507, 510 (1967)). Here, Plaintiff, a North Carolina resident, alleges a breach of contract by Defendant, a Pennsylvania corporation with its principal place of business in Pennsylvania. The record shows only that Defendant prepared the Confidentiality Agreement and both parties signed it. It is not clear, however, whether the last act by either of the parties essential to a meeting of the minds occurred in Pennsylvania or in North Carolina. This fact does not unnecessarily complicate matters, however, because the law of contract interpretation in these two states does not differ substantively. Thus, the court will apply North Carolina law in analyzing Plaintiff's contractual claims.

As for Plaintiff's tort-like claims, the North Carolina Supreme Court adheres to the choice-of-law rule of *lex loci delicti*, which provides that the law of the "place of the wrong" controls, and the place of the wrong is the locale in which "the last

Case 1:04-cv-00389-WWD   Document 55   Filed 03/08/06   Page 21 of 48

event necessary to make a defendant liable for an alleged tort occurs." *Rhone-Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp. 2d 554, 555 (M.D.N.C. 1999) (quoting *Brendle v. General Tire & Rubber Co.*, 408 F.2d 116, 117 n.3 (4th Cir. 1969)); *see also New England Leather Co. v. Feuer Leather Corp.*, 942 F.2d 253, 255 (4th Cir. 1991). Here, the last event necessary to render Defendant liable was Plaintiff's injury, which occurred in North Carolina where Plaintiff's business is based. *See ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 49 n.11 (4th Cir. 1983) (noting that financial injuries sustained by "a North Carolina corporation with its principal place of business in North Carolina . . . were sustained in the state of North Carolina"); *Speedway Promoters, Inc. v. Hooter's of Am., Inc.*, 123 F. Supp. 2d 956, 962 (W.D.N.C. 2000) (stating that the economic injury to the plaintiff was the last event in a tortious interference claim to make the defendant liable); *Rhone-Poulenc Agro S.A.*, 73 F. Supp. 2d at 555 (in addressing a fraud claim, stating that the last event was the injury to plaintiff, which occurred in the state in which the plaintiff suffered an economic impact). Here, the court finds that the place where the last event occurred as to Plaintiff's claims sounding in tort was North Carolina, since that is the state where Plaintiff's economic loss was felt. Therefore, the court will apply North Carolina law to those claims by Plaintiff sounding in tort.[8]

---

[8] With regard to Plaintiff's unfair and deceptive trade practices claim, the North Carolina Court of Appeals has been split over whether the court should apply a "significant relationships" test or the "place of injury" test, and the North Carolina Supreme Court does not appear to have resolved the issue. *See Stetser v. TAP Pharm. Prods. Inc.*, 165 N.C. App. 1, 15, 598 S.E.2d 570, 580 (2004) (discussing the

<u>Plaintiff's Breach of Contract Claim</u>

The court first addresses Defendant's motion for summary judgment as to Plaintiff's breach of contract claim. Under North Carolina law, the elements for a claim for breach of contract are (1) the existence of a valid contract and (2) breach of the terms of that contract. *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). A breach of contract is only actionable if a material breach occurs–that is, one that substantially defeats the purpose of the agreement or that goes to the very heart of the agreement, or can be characterized as a substantial failure to perform. *Fletcher v. Fletcher*, 123 N.C. App. 744, 752, 474 S.E.2d 802, 807-08 (1996). Moreover, "[a] valid contract requires offer, acceptance, consideration and no defenses to formation." *Collie v. Wehr Dissolution Corp.*, 345 F. Supp. 2d 555, 558 (M.D.N.C. 2004) (internal quotations omitted) (quoting *Koltis v. North Carolina Dep't Human Res.*, 125 N.C. App. 268, 271, 480 S.E.2d 702, 704 (1997)). It is essential to the formation of any contract that there be "'mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds.'" *Id.* (quoting *Creech v. Melnik*, 347 N.C. 520, 527, 495 S.E.2d 907, 911-12 (1998)). Mutual

---

conflicting court of appeals opinions). This court has interpreted the conflicting North Carolina court of appeals opinions to hold that where the place of injury is uncertain the significant relationships test should apply. *See North Carolina Mut. Life Ins. Co. v. McKinley Fin. Serv., Inc.*, 386 F. Supp. 2d 648, 658 n.4 (M.D.N.C. 2005). Here, however, the place of injury is not uncertain, as Plaintiff was clearly injured in North Carolina, where he operates his sole proprietorship. Thus, there is no need to apply the "significant relationships" test to Plaintiff's unfair and deceptive trade practices claim, and the court finds that the law of North Carolina applies to this claim.

assent–or a "meeting of the minds"–requires that the party accepting an offer communicate to the offeror an acceptance of the "exact terms" set out in the offer. *Id.* In other words, "'[t]here must be neither doubt nor difference between the parties. They must assent to the same thing in the same sense and their minds must meet as to all the terms. If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement.'" *MCB Ltd. v. McGowan*, 86 N.C. App. 607, 608-09, 359 S.E.2d 50, 51 (1987) (quoting *Croom v. Goldsboro Lumber Co.*, 182 N.C. 217, 220, 108 S.E. 735, 737 (1921)). Moreover, to be enforceable, the terms of a contract must be sufficiently definite and certain, *Brooks v. Hackney*, 329 N.C. 166, 170, 404 S.E.2d 854, 857 (1991), and a contract that "leav[es] material portions open for future agreement is nugatory and void for indefiniteness," *MCB Ltd.*, 86 N.C. App. at 609, 359 S.E.2d at 51 (quoting *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974)). Therefore, when the plaintiff's forecast of evidence shows that the parties never reached a meeting of the minds as to the essential terms of the agreement, or where the terms are not sufficiently definite, summary judgment in favor of the defendants is proper. *Elliott v. Duke Univ., Inc.*, 66 N.C. App. 590, 596, 311 S.E.2d 632, 636 (1984).

Here, Plaintiff contends that Defendant breached the Confidentiality Agreement between the parties by using Plaintiff's chemical formulas and other proprietary information in order to sell the same products to Hatfield that Plaintiff had previously sold to Hatfield. (1 McElmurry Dep. 93:22 to 94:9; 106:9-12.) Defendant

-24-

presents the following grounds for granting summary judgment in favor of Defendant on this claim: (1) that the Agreement is void for indefiniteness; i.e., there was no meeting of the minds; (2) that the Agreement is in reality a covenant not to compete and is invalid under North Carolina law as an improper restraint on trade; (3) and that Plaintiff has materially breached the Agreement and Defendant is, therefore, excused from performing under the Agreement. The court will address each of Defendant's arguments in turn.

<u>Whether the Confidentiality Agreement is Void for Indefiniteness</u>

Defendant first contends that it is entitled to summary judgment on Plaintiff's breach of contract claim because the Confidentiality Agreement is void for indefiniteness. Defendant argues that the Confidentiality Agreement does not define numerous key words and phrases, including: "proprietary knowledge," "similar," "unfair advantage," and "customer." Defendant further argues that the parties dispute whether "proprietary knowledge" as used in the contract is limited to knowledge that Plaintiff acquired through its own efforts or includes all information that Defendant or Plaintiff obtained from Hatfield. (1 Russ Dep. 111:25 to 117:6.) Defendant further argues that the parties dispute whether a similar formula would describe only products that are chemically identical in composition, production, and function, or whether this definition includes any product that contains merely one ingredient in common, such as caustic soda as Plaintiff claims.

-25-

Defendant also maintains that the Confidentiality Agreement, entered into on April 6, 1993, does not indicate whether it applies to products that existed or were transferred before that date. According to Defendant, Plaintiff's only alleged contribution to a formula occurred in 1986 when he provided ingredient lists to Malachi Sorgenfrei, who was Defendant's technical director. According to Defendant, after 1986 Defendant developed all of its products without input from Plaintiff. Therefore, according to Defendant, any products developed after April 6, 1993, are "strictly [Defendant's] developed products and would not be covered by the Confidentiality Agreement." Defendant argues, therefore, if there is a valid contract, then it has no application to any "formula" of Plaintiff's and that Defendant is entitled to judgment as a matter of law.

This court does not agree that the contract is void for lack of indefiniteness or that there was no "meeting of the minds," as Defendant contends. Indeed, the court agrees with Plaintiff that there are factual issues in this case that cannot be resolved on summary judgment. *See Koltis v. N.C. Dep't of Human Res.*, 125 N.C. App. 268, 271, 480 S.E.2d 702, 703 (1997) (stating that "a contract need not definitely and specifically contain in detail every fact to which the parties are agreeing. It is sufficient if the terms can be made certain by proof"). First, although Defendant points to the fact that certain terms in the Agreement are not defined, the North Carolina courts have made clear that when a term is not defined in a contract, the presumption is that the term is to be given its ordinary meaning and significance.

-26-

*E.L. Scott Roofing Co. v. State,* 82 N.C. App. 216, 223, 346 S.E.2d 515, 520 (1986). Therefore, the fact that certain terms in the contract are not defined does not render it too indefinite to be enforced. Moreover, as to Defendant's argument that Plaintiff disclosed to Defendant only one chemical formula over the course of the parties' relationship, and that formula was disclosed in 1986 before the Confidentiality Agreement was executed, the court finds that there are issues of fact regarding what chemical formulas Plaintiff disclosed to Defendant and when the formulas were disclosed. Finally, and significantly, Defendant was the party that prepared the Agreement in this case. Therefore, the terms of the contract must be construed against Defendant, which, as the drafter of the Confidentiality Agreement, "had the best opportunity to protect its interests." *Silvers v. Horace Mann Ins. Co.*, 324 N.C. 289, 295, 378 S.E.2d 21, 25 (1989) (holding that contracts are construed against the drafter). For these reasons, the court finds that the Confidentiality Agreement is not void for indefiniteness, and the court will deny Defendant's summary judgment motion on the breach of contract claim on this basis.

Whether the Confidentiality Agreement is Really a Covenant not to Compete and is Void as Contrary to Public Policy

Alternatively, Defendant argues that the Confidentiality Agreement is an unenforceable non-compete agreement. Defendant contends that since Plaintiff's purpose in entering into the Confidentiality Agreement was to prevent Defendant from competing with him, the "Confidentiality Agreement" was in substance, if not in

-27-

form, a non-compete agreement. The court does not agree. Under North Carolina law, contracts in restraint of trade are illegal. N.C. GEN. STAT. § 75-1 (1999) ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal."). North Carolina courts carefully scrutinize agreements that preclude competition. *See, e.g., United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 370 S.E.2d 375 (1988). To be enforceable, covenants must be (1) in writing; (2) based upon valuable consideration; (3) reasonably necessary for the protection of legitimate business interests; (4) reasonable as to time and territory; and (5) not otherwise against public policy. *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 302 S.E.2d 754 (1983). "[A] further consideration . . . in recognizing the validity of [covenants not to compete], is that at the time of entering . . . covenants not to compete both parties apparently regarded the restrictions as reasonable and desirable." *United Labs., Inc.,* 322 N.C. at 649, 370 S.E.2d at 380. In contrast to covenants not to compete, confidentiality agreements are not restraints of trade if their purpose and effect is merely to prevent disclosure or use of confidential information. *Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 135 F. Supp. 2d 722, 730 (M.D.N.C. 2001).

Here, Defendant maintains that the Confidentiality Agreement contains no time or territorial limitation, is not part of a contract for employment or for sale of a business, and that there was no separate consideration to support it. Defendant argues, moreover, that the Confidentiality Agreement covering product formulas

-28-

"cannot be necessary for the protection of Plaintiff's business interest since he shared the formulas with other suppliers without obtaining a confidentiality agreement from them." Defendant argues further that "even assuming that the Confidentiality Agreement was necessary for protection of Plaintiff's business interest, it was not necessary for a legitimate business interest–that is, to keep prices to Hatfield inflated." Finally, Defendant argues that it is contrary to public policy and unfair to Defendant and the consuming public to prevent Defendant from selling to Hatfield the sanitation products developed by Defendant and which Hatfield desires.

The court agrees with Plaintiff that under North Carolina law the Confidentiality Agreement was not a covenant not to compete and, therefore, was not an illegal restraint on trade. By its plain and unambiguous terms, the Confidentiality Agreement includes the following two prohibitions–first, that neither company will use the other's formulas or other proprietary knowledge to unfair advantage and/or with the purpose of selling the same or similar products to the other's customers. *Id.* Second, neither Plaintiff nor Defendant will "share these formulas or knowledge with any third party[]." *Id.* The Agreement is not a blanket prohibition on competition as claimed by Defendant, but rather, the Agreement simply prevents the parties from using the other's "formula or other proprietary knowledge to unfair advantage or with the purpose of selling the same or similar products to the other's customers," and prevents the parties from sharing "these formulas or other proprietary knowledge" with any third party without the other's consent. A North Carolina court of appeals

-29-

case with similar facts supports this conclusion. In *Chemimetals Processing, Inc. v. McEneny*, 124 N.C. App. 194, 476 S.E.2d 374 (1996), the plaintiff, a chemical manufacturer, entered into a written agreement with the defendant, the sole distributor for the plaintiff's chemicals.[9]  In the written agreement, the distributor defendant agreed not to recreate the plaintiff's product line or a similar product line in direct competition with the plaintiff's product line.  More specifically, the written agreement contained the following, pertinent terms:

> [Defendant] shall not directly or indirectly manufacture or otherwise create or recreate (or attempt to) the VC 17/18/19/20 Product Line or Process, or any similar chemical agent or compound, or any chemical agent or compound in direct competition with the VC 17/18/19/20 Product Line, except as required by this Agreement or with the express prior written consent and approval of [Plaintiff].

The written agreement also stated that "the makeup or composition of the [Product Line] and the knowledge or technology of ChemiMetals regarding the [Product Line] and [its] Process are proprietary to ChemiMetals, highly valuable to ChemiMetals . . . and are confidential to ChemiMetals."  When the defendant later began to manufacture and distribute the plaintiff's product line, the plaintiff filed a lawsuit against the defendant and sought a preliminary injunction from the court.  The trial court entered a preliminary injunction against the defendant, prohibiting the defendant from violating the terms of the written agreement.

On appeal, the North Carolina Court of Appeals stated that the issue before

---

[9]  The individual distributor and his company were both named as "Defendants," but for simplicity the court here merely refers to them together as one Defendant.

it was whether the written agreement was a contract in restraint of trade and therefore invalid. The court of appeals found that the agreement was not a restraint in trade, observing:

> Our Courts have a long history of carefully scrutinizing "covenants that preclude a seller of a business from competing with the new owner" and covenants that prevent an employee from competing with his former employer. These covenants, to be valid, are required to be (1) in writing, (2) part of the contract of employment or sale of the business, (3) based on valuable consideration, (4) reasonably necessary for the protection of the promise's legitimate business interest, and (5) reasonable as to time and territory. An agreement is not in restraint of trade, however, if it does not seek to prevent a party from engaging in a similar business in competition with the promisee, but instead seeks to prevent the disclosure or use of confidential information. Such agreements may, therefore, be upheld even though the agreement is unlimited as to time and area . . . upon a showing that it protects a legitimate business interest of the promisee.

> In this case, the purpose of the Agreement is not to preclude the defendants from competing with ChemiMetals in a similar business. The Agreement simply prevents the defendants from using the "composition," "technology," and "[p]rocess" utilized by ChemiMetals in the manufacture of the Product Line, which information the defendants acknowledged to be the property of and confidential to ChemiMetals. It follows that the prohibition against the manufacturing of the Product Line is reasonably related to the protection of the confidential information and thus serves a legitimate business interest of ChemiMetals.

*Id.* (citations omitted). Based on this reasoning, the court of appeals upheld the preliminary injunction against the defendant.

Here, like the agreement in *Chemimetals Processing v. McEneny*, the Confidentiality Agreement in this case does not preclude either party from competing with the other in the chemical manufacturing or marketing business. That is, as in

-31-

*Chemimetals Processing,* Defendant here was free to sell its *own* chemicals to another distributor in competition with Plaintiff without violating the Agreement. The Agreement merely prohibits the parties from using each other's confidential formulas to manufacture chemicals and then selling them to third parties without the consent of the other. Therefore, Defendant's recitation of North Carolina's six-prong test for determining the enforceability of an employee's covenant not to compete is irrelevant because the Confidentiality Agreement in this case was a confidentiality agreement, not a covenant not to compete, and because there is no employee/employer relationship in this case. Here, the Agreement arose from an arms-length transaction involving Plaintiff and Defendant, who were two separate business entities. Accordingly, the court finds that the Confidentiality Agreement is not an invalid restraint on trade, and the court, therefore, denies Defendant's motion for summary judgment on this basis.

Plaintiff's Own Alleged Breach

Defendant finally contends that it is excused from performing under the Confidentiality Agreement because Plaintiff materially breached the Agreement by sharing the formulas in question with other manufacturers. The court does not agree. As Plaintiff points out, the Agreement prohibits one party from disclosing the other party's confidential information. Specifically, under the Agreement, neither company may share the *other's* formula or other proprietary knowledge with any third party. The Agreement does not prohibit either party from disclosing its *own* formulas

-32-

to third parties, which is the nature of Plaintiff's alleged breach here. Furthermore, Plaintiff maintains that the undisputed facts show that Plaintiff never shared Defendant's formulas or other proprietary knowledge with any third party, and Defendant has not brought forward any evidence to the contrary. McElmurry Decl. ¶ 12. Therefore, the court will deny Defendant's summary judgment on the breach of contract claim on the ground that Plaintiff has materially breached the contract.

Plaintiff's Claim for Conversion

The court next addresses Defendant's motion for summary judgment on Plaintiff's claim for conversion. In support of his conversion claim, Plaintiff testified in his deposition that Defendant "converted my business at Hatfield to their business at Hatfield" and "[a]s far as good will, they certainly converted good will. They've converted–they've converted the relationship I had with Hatfield in general, and some of the people in specific." (2 McElmurry Dep. 9:24-10:14.) Under North Carolina law, conversion is defined as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights. *Spinks v. Taylor*, 303 N.C. 256, 264, 278 S.E.2d 501, 506 (1981). A plaintiff in a conversion action must, therefore, prove his interest in the property and the alleged convertor's unauthorized dominion over the property. *See United States v. Whedbee*, 964 F.2d 330, 333 (4th Cir. 1992). Furthermore, in North Carolina,

> only goods and personal property are properly the subjects of a claim
> for conversion. A claim for conversion does not apply to real property.

> Nor are intangible interests such as business opportunities and expectancy interests subject to a conversion claim.

*Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 414, 537 S.E.2d 248, 264 (2000) (citations omitted). Here, since Plaintiff has not presented evidence of any goods and personal property being converted by Defendant, Defendant is entitled to summary judgment on this claim.

<u>Plaintiff's Claim for Tortious Interference with Business Relations</u>

The court next considers Defendant's motion for summary judgment on Plaintiff's claim for tortious interference with business relations. Here, it is not clear whether Plaintiff asserts a claim for tortious interference with existing business relations or a claim for tortious interference with prospective economic advantage. Regardless of which claim Plaintiff intends to bring, Defendant is entitled to summary judgment on both claims. First, to prove tortious interference with existing business relations, a plaintiff must prove that there was (1) a valid contract between the plaintiff and a third person; (2) that the defendant knows of the contract; (3) that the defendant intentionally induced the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff. *See United Labs., Inc.*, 322 N.C. at 661, 370 S.E.2d at 387. To demonstrate the element of acting without justification, the action must indicate "no motive for interference other than malice." *Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 674, 541 S.E.2d 733, 738 (2001). With respect to claims of interference with business relations by competing business entities, the North Carolina Supreme

-34-

Court has further stated that interference is justified if it can be shown that the defendant acted for a "legitimate business purpose" and was not merely motivated by a "malicious wish to injure plaintiff." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988). As the court stated in *Peoples Security Life Insurance Company v. Hooks*, courts "have recognized that competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." *Id.; see also Robinson, Bradshaw & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 318, 498 S.E.2d 841, 850 (1998) (stating that a defendant may encourage the termination of a contract "if he does so for a reason reasonably related to a legitimate business interest") (quoting *Fitzgerald v. Wolf*, 40 N.C. App. 197, 200, 252 S.E.2d 523, 524 (1979)). A legitimate business interest may include competition, including the competition between a plaintiff and a defendant for a third party's business. *See Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 523, 586 S.E.2d 507, 510 (2003).

Given the above-recited elements, Plaintiff cannot survive Defendant's motion for summary judgment on the tortious interference with contract claim. First, Hatfield and Plaintiff were never parties to a valid purchase contract. Hatfield placed orders from Plaintiff as it desired, and its only obligation to Plaintiff was to pay for any orders

-35-

that it placed.[10]   Furthermore, Plaintiff has not offered evidence to show that

Defendant acted with no motive for interference *other* than malice.   *Filmar Racing,*

*Inc.,* 141 N.C. App. at 674, 541 S.E.2d at 738.   That is, even if Defendant was

motivated by a desire to compete against Plaintiff and Zee for Hatfield's business,

this constitutes a legitimate business purpose for Defendant actions.[11]   Thus, any

claim that Plaintiff has on these facts for tortious interference with existing business

relations cannot withstand Defendant's summary judgment motion.

The court next considers Defendant's motion for summary judgment to the

extent that Plaintiff is bringing a claim for tortious interference with prospective

economic advantage.   To prove a claim for tortious interference with prospective

economic advantage, a plaintiff must show that the defendant acted without

justification in "inducing a third party to refrain from entering into a contract with them

which contract would have ensued but for the interference."   *Cameron v. New*

*Hanover Mem'l Hosp., Inc.*, 58 N.C. App. 414, 440, 293 S.E.2d 901, 917 (1982).

Essential to a claim for tortious interference with prospective economic advantage

is first identifying a contract that the defendant induced a third party to refrain from

---

[10]   Plaintiff has presented no evidence that Defendant contacted any of Plaintiff's
customers other than Hatfield, that Plaintiff lost any customer other than Hatfield to
Defendant, or that Defendant attempted to interfere with Plaintiff's relationships with
any other customer.

[11]   Of course, Defendant maintains that it was not competing with Plaintiff for
Hatfield's business because Plaintiff had already lost Hatfield's business when
Defendant took its business proposal to Hatfield.   Defendant argues that was
competing only with Zee Company by that point.

entering. *DaimlerChrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002). Here, Plaintiff maintains that Defendant interfered with Plaintiff's existing contract with Hatfield, but Plaintiff fails to identify any future contracts with any specificity. Plaintiff's mere expectation of future contracts with Hatfield is not enough to maintain a tortious interference with prospective advantage claim. *See id.* Therefore, Defendant is entitled to summary judgment as to any claim that Plaintiff purports to bring for tortious interference with prospective economic advantage.

Plaintiff's Claim under the North Carolina Trade Secrets Protection Act

The court next considers Defendant's motion for summary judgment on Plaintiff's claim for misappropriation of trade secrets under the North Carolina Trade Secrets Protection Act, N.C. GEN. STAT. § 66-152 et seq. Under the North Carolina Trade Secrets Act, "misappropriation" is defined as the

> acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret.

N.C. GEN. STAT. § 66-152(1) (2001). To show a prima facie case of misappropriation, the plaintiff must introduce substantial evidence to show that the defendant "(1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. GEN. STAT. § 66-155 (2001). Moreover, a plaintiff must identify a trade secret with

-37-

sufficient particularity so as to enable a defendant to determine exactly what he is accused of misappropriating and whether misappropriation has or is threatened to occur. *See Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003). In addition, a plaintiff must come forward with evidence that he took "special precautions to ensure the confidentiality of its customer information." *NovaCare Orthotics & Prosthetics East, Inc. v. Speelman*, 137 N.C. App. 471, 478, 528 S.E.2d 918, 922 (2000).

The threshold question in any trade secrets case is whether the information obtained constitutes a trade secret. *Combs & Assocs., Inc. v. Kennedy*, 147 N.C. App. 362, 369, 555 S.E.2d 634, 639 (2001). Under section 66-152(3), a trade secret is defined in the following manner:

> "Trade secret" means business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. GEN. STAT. § 66-152(3) (2001). Section 66-152(3) goes on to state that "[t]he existence of a trade secret shall not be negated merely because the information comprising the trade secret has also been developed, used, or owned independently by more than one person, or licensed to other persons." To determine what

-38-

information should be treated as a trade secret, a court should consider the following factors:

> (1) the extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*State ex rel. Utils. Comm'n v. MCI*, 132 N.C. App. 625, 634, 514 S.E.2d 276, 282 (1999) (quoting *Wilmington Star-News v. New Hanover Reg'l Med. Ctr.*, 125 N.C. App. 174,180-81, 480 S.E.2d 53, 56 (1997)).  To survive a motion for summary judgment, a plaintiff must show facts that would allow a reasonable finder of fact to conclude that the information at issue was not "generally known or readily ascertainable" and that the plaintiff made reasonable efforts to maintain the information's secrecy.   *See Area Landscaping, L.L.C.*, 160 N.C. App. at 525, 586 S.E.2d at 511.

Here, Defendant contends that Plaintiff has not identified his alleged trade secrets with sufficient particularity for the court to determine whether any misappropriation has occurred and that, therefore, Defendant is entitled to summary judgment.  Defendant further argues that Plaintiff has introduced no evidence that Defendant knows or should have known of Plaintiff's trade secrets and had a specific opportunity to acquire it for disclosure or use or acquired, disclosed, or used it without Plaintiff's express or implied consent or authority.  Defendant argues,

moreover, that assuming Plaintiff identified his trade secrets with sufficient particularity, Plaintiff has introduced no evidence that he took "special precautions to ensure the confidentiality of its customer information."  Defendant argues that "to the contrary, Plaintiff did nothing to protect any information. Defendant points out, finally, that Plaintiff has admitted that Hatfield was free to share with anyone, including Defendant, information regarding its cleaning habits, its problems in the past, how it sanitized, what kind of equipment it used, what products it used, what personnel it used, what personnel were in charge, the payout of its facilities, its future plans, and acquisition plans."  (*See* Def.'s Br. at 17 (citing 2 Russ Dep. 24:20 to 25:24).) Defendant contends that the information Plaintiff claims to be a "trade secret" does not meet that definition as stated by North Carolina law, and Defendant is therefore entitled to summary judgment.

The court finds that, when reviewing the evidence in the light most favorable to Plaintiff, Plaintiff has presented enough evidence to withstand Defendant's summary judgment motion on this claim.  First, Defendant cites to Plaintiff's deposition testimony in which he stated that his trade secrets consisted of his "formulas," any information on Hatfield, and anything that Plaintiff or AFCO learned from Hatfield.  (2 McElmurry Dep. 18:4-7; 18:19-25; 16:24-20:3.)  The court agrees with Defendant that Plaintiff's claim to  "any information" that it had on Hatfield as a trade secret is not specific enough to alert Defendant or the court to what Plaintiff alleges Defendant has misappropriated. At least to the chemical formulas, however,

-40-

Plaintiff's description of the chemical formulas that he provided to Defendant are certainly specific enough.[12]  Furthermore, although Defendant argues that Plaintiff has done nothing to ensure the confidentiality of its formulas, the Confidentiality Agreement in this case positively belies Defendant's argument.  The Confidentiality Agreement specifically states that the parties are providing each other with formulas and other proprietary information and that the parties may not disclose this information to third parties without the consent of the other party.  Additionally, on the Material Safety Data Sheets prepared by both parties, both Plaintiff and Defendant note that "[t]he specific chemical identity of the non-hazardous ingredients in this product are being withheld as a 'trade secret.'" (Nobel Decl. Ex. K.) Therefore, the court does not agree with Defendant that Plaintiff did nothing to maintain the confidentiality of the chemical formulas that it provided to Defendant.  Furthermore, there are issues of fact regarding this claim that cannot be resolved on summary judgment.  For instance, Defendant argues that after Plaintiff supplied the chemical formulas to Defendant that Defendant tinkered with the formulas to come up with the final cleaning products and, therefore, Plaintiff does not "own" the chemical formulas

_____

[12]  Moreover, as Plaintiff notes, Defendant has admitted that its own chemical formulas are proprietary and confidential trade secrets. (*See* Nobel Decl. at Ex. J, Admission Nos. 2 and 3.)  Defendant has not sufficiently explained why its chemical formulas are trade secrets, but Plaintiff's chemical formulas are not trade secrets.  As for any information beyond the chemical formulas that may constitute trade secrets, Plaintiff will have the burden at trial of sufficiently identifying this information and showing that he took specific precautions to protect it.

for certain of his products as trade secrets.[13] Plaintiff generally denies that the formulas were altered as such. As the court finds that these are facts that are best left for a jury to decide, the court will deny summary judgment as to this claim.

Plaintiff's Claim under the Unfair and Deceptive Trade Practices Act

In his final claim, Plaintiff asserts that Defendant has committed unfair and deceptive trade practices under N.C. GEN. STAT. § 75-1.1. The statute provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."[14] N.C. GEN. STAT. § 75-1.1(a)(2003). The elements of a claim for unfair and deceptive practices in violation of section 75-1.1 are: (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business. *Furr v. Fonville Morisey Realty, Inc.*, 130 N.C. App. 541, 551, 503 S.E.2d 401, 408 (1998). A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive. *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987) (citing *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981)). To prevail on an unfair and deceptive trade practices claim, "deliberate acts of deceit or bad faith do not have

---

[13] In fact, in response to Plaintiff's request for admissions, Defendant denied that Plaintiff provided *any* chemical formulas to Defendant during their business relationship. (*See* Noble Decl. at Ex. J, Admission No. 4.) Since Plaintiff argues that he did provide chemical formulas to Defendant, this is clearly an issue of fact that cannot be resolved on summary judgment.

[14] A finding that a party has violated section 75-1.1 entitles the plaintiff to treble its recovery of damages. N.C. GEN. STAT. § 75-16 (2003).

to be shown." *Boyd v. Drum*, 129 N.C. App. 586, 593, 501 S.E.2d 91, 97 (1998).

Indeed, the North Carolina courts have held that "it is not necessary for the plaintiff

to show fraud, bad faith, deliberate or knowing acts of deception, or actual

deception," but the "plaintiff must . . . show that the acts complained of possessed

the tendency or capacity to mislead, or created the likelihood of deception."

*Overstreet v. Brookland, Inc.*, 52 N.C. App. 444, 452-53, 279 S.E.2d 1, 7 (1981).

Although the determination as to whether an act is unfair or deceptive is a

question of law for the court, the underlying facts are questions of fact for the jury.

*Gray v. North Carolina Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676,

681 (2000). Furthermore, where, as here, the activity of two competing businesses

is at issue, the appropriate inquiry is whether there has been a showing of "unfair

methods of competition." The statute itself does not define what conduct constitutes

unfair methods of competition. Nor have the North Carolina courts articulated a

precise definition, employing a case-by-case approach instead, and stating:

> Unfair competition has been referred to in terms of conduct "which a
> court of equity would consider unfair . . . ." Thus viewed, the fairness
> or unfairness of particular conduct is not an abstraction to be derived
> by logic. *Rather, the fair or unfair nature of particular conduct is to be
> judged by viewing it against the background of actual human
> experience and by determining its intended actual effects upon others.*

*McDonald v. Scarboro*, 91 N.C. App. 13, 18, 370 S.E.2d 680, 684 (1988) (emphasis

added) (quoting *Harrington Mfg. Co. v. Powell Mfg. Co.*, 38 N.C. App. 393, 400, 248

S.E.2d 739, 744 (1978)). Furthermore, a Chapter 75 action can be maintained

where the breaching party to a contract "engages in conduct that amounts to an

inequitable assertion of its power or position." *Libby Hill Seafood Rests., Inc. v. Owens*, 62 N.C. App. 695, 700, 303 S.E.2d 565, 569 (1983).

The North Carolina courts have further stated that a breach of contract, even if intentional, does not *alone* constitute an unfair trade practice. *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (N.C. 1992). Instead, "a plaintiff must show substantial aggravating circumstances attending the breach to recover under the act." *Id.* (quoting *Bartolomeo v. S.B. Thomas, Inc.,* 889 F.2d 530, 535 (4th Cir. 1989)).  Here, Defendant maintains that Plaintiff has not presented evidence on summary judgment of substantial aggravating circumstances attending the alleged breach of the Confidentiality Agreement and, therefore, the claim for unfair and deceptive trade practices cannot withstand summary judgment. For the following reasons, the court does not agree.

Here, Plaintiff has presented evidence to the court which, taken in the light most favorable to Plaintiff, could convince a juror that Defendant made efforts to sabotage Plaintiff's business relationship with Hatfield in order to gain the account from Hatfield, while at the same time intentionally deceiving Plaintiff about what was going on with the Hatfield account, and then selling products made from Plaintiff's proprietary formulas and passing them off as being owned by Defendant.  For instance, the evidence could convince a juror that, as Plaintiff puts it, Defendant "engaged in a pattern of deceit with both Plaintiff and Hatfield" in order to be awarded the corporate account.  Moreover, Plaintiff has presented evidence showing

-44-

that Defendant offered to Plaintiff help with its audit of the Hatfield facility by sending Defendant's "best guy" for the audit, who turned out to be interested only in taking breaks and smoking cigarettes before abruptly leaving.  (Roseboro Dep. 49:9 to 50:4.)  Defendant's President Hinkle told Plaintiff that the Hatfield account had been lost to Plaintiff and Defendant, and that there was nothing that Plaintiff could do about it.  The day after Hinkle told Plaintiff that the Hatfield account to lost to both Plaintiff and Defendant, however, Hinkle wrote a letter to Hatfield to discuss Defendant's impending presentation of a business plan and attached an "AFCO Product" list, which contained some of Plaintiff's products.  *See* Noble Decl., Ex. H. Furthermore, Plaintiff maintains that around this same time Defendant was visiting the Hatfield facility "at least maybe a dozen times" to capture the account.  (Oser Dep. 29:2-10.)  Defendant's employees testified that Hatfield initiated the meetings with Defendant, but Hatfield's employees testified to the contrary that Defendant approached Hatfield first and falsely misrepresented the relationship between Plaintiff and Defendant by claiming that the Hatfield account was being shifted away from Plaintiff and towards Defendant as a "corporate account."  As Hatfield's employees testified, they did not understand the relationship between the parties at that time and thought that Plaintiff was merely a distributor for Defendant, and Plaintiff has introduced evidence showing that Defendant took advantage of Hatfield's ignorance in this regard in an attempt to capture the account. *First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 131 N.C. App. 242, 254, 507 S.E.2d 56, 64

-45-

(1998) (stating that "we conclude the statements of Harris to Thompson concerning the status of the accounts may properly be considered deceptive in view of evidence that Harris knew the list of the accounts attached to the Agreement did not accurately represent the accounts which plaintiff believed it was purchasing") (citing *Kron Med. Corp. v. Collier Cobb & Assocs.*, 107 N.C. App. 331, 339, 420 S.E.2d 192, 196 (1992) (stating that failure to disclose information may be tantamount to misrepresentation and thus constitute an unfair or deceptive trade practice)). Indeed, Plaintiff's evidence, if believed, tends to show that Defendant's employees told Hatfield representatives that Plaintiff was merely Defendant's distributor and that Defendant sold Defendant's products to Plaintiff. (Race Dep. 54:19-23.) The court finds that these are sufficient, attendant aggravating circumstances to deny the motion for summary judgment. *Accord Southern Bldg. Maintenance v. Osborne*, 127 N.C. App. 327, 334, 489 S.E.2d 892, 897 (1997) (finding that the defendant's actions were unfair and deceptive trade practices within the meaning of Chapter 75 and "more than the simple breach of contract militated by defendant," where the defendant continued to interfere with contractual relationships while negotiating a settlement with the current owner of those contracts).

Defendant maintains, however, that its conduct did not cause Plaintiff to lose its business relationship with Hatfield because Plaintiff would have lost the account and it would have gone to Zee Company regardless of Defendant's conduct. It is true that Plaintiff also must ultimately show that the injury suffered is of a type which

-46-

Defendant's conduct was naturally likely to cause. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 697 n.7 (1962). A defendant may attempt to show that the decline in plaintiff's profits or the loss of sales in its business was not caused by illegal acts, but instead resulted from other factors, such as change, economic conditions, or mismanagement. *American Rockwool, Inc. v. Owens Corning Fiberglas Corp.*, 640 F. Supp. 1411, 1445 (E.D.N.C.1986). Where such evidence is offered, however, resolution of the issue is for the trier of fact. *Id.* In other words, "[u]nder the UDTPA, proximate cause is a question of fact." *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 620 S.E.2d 222, 232 (N.C. Ct. App. 2005). Here, Plaintiff has presented evidence which, taken in the light most favorable to Plaintiff, tends to show that in attendance with the breach of the Confidentiality Agreement, Defendant participated in various deceptive behaviors in an attempt to secure the Hatfield account and that Defendant used its position and superior knowledge in an unfair manner in order to secure the account. Therefore, Defendant's motion for summary judgment will be denied as to Plaintiff's claim for unfair and deceptive trade practices.

## CONCLUSION

For the reasons stated herein, Defendant's motion to strike portions of Plaintiff Russel McElmurry's Declaration (docket no. 46) is **DENIED**. Furthermore, Defendant's motion for summary judgment (docket no. 30) is **GRANTED** in part and **DENIED** in part. More specifically, the motion is granted as to Plaintiff's claims for

-47-

conversion and tortious interference with business relations, and the motion denied as to Plaintiff's claims for breach of contract, misappropriation of trade secrets, and unfair or deceptive trade practices.  No just reason for delay appearing, a judgment conforming to this order will be entered simultaneously herewith.

**IT IS SO ORDERED.**

_____
WALLACE W. DIXON
United States Magistrate Judge

March 8, 2006